**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | |
|---|---|
| GREATER NEW YORK MUTUAL INSURANCE COMPANY | |
| Plaintiff, | No. 3:19-cv-01741 (MPS) |
| v. | |
| ROBBINS EYE CENTER P.C., KIM P. ROBBINS M.D., COMMERCE PARK ASSOCIATES, LLC, and RDR MANAGEMENT, LLC | |
| Defendants | |

**RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

This action, which grew out of a landlord-tenant dispute, concerns whether the landlord's insurer must pay the judgment the tenant won against the landlord in the underlying lawsuit. After a trial in the Connecticut Superior Court on its claim that the landlord, Commerce Park Associates, LLC ("CPA"), had constructively evicted it from the property, the tenant, Robbins Eye Center P.C. ("REC"), won a substantial money judgment against CPA and sought payment of the judgment from CPA's liability insurer, Greater New York Mutual Insurance Company ("GNY"). GNY later brought this action seeking a declaratory judgment against REC, CPA, and others that there is no coverage under the policy for the state court judgment. ECF No. 1 ¶ 1. REC has brought counterclaims against GNY for breach of contract and unjust enrichment for GNY's failure to pay the judgment. *Id.* at 16-17. REC and GNY both move for summary judgment. ECF Nos. 52, 57. For the reasons below, I grant GNY's motion for summary judgment and deny REC's motion for summary judgment.

I. **BACKGROUND**

1

The following facts are taken from the parties' Local Rule 56(a) Statements and from the record and are undisputed unless otherwise indicated.

### A.  The Leased Premises

CPA owned a commercial building at 4695 Main Street, Bridgeport, Connecticut and leased an office space within that building ("Leased Premises") to Dr. Kim Robbins pursuant to a lease dated August 1, 2017.  ECF No. 63 at 2 ¶ 3; ECF No. 59 at 1–2 ¶ 1.  RDR Management, LLC ("RDR") was the property management company for CPA.  ECF No. 59 at 7 ¶ 19.  Dr. Robbins operated her ophthalmological practice, REC, at the Leased Premises.  *Id.* at 1–2 ¶ 1. REC paid the monthly rent and also paid for "substantial improvements" to the Leased Premises, carried the insurance required by the lease, and was the "*de facto* tenant" of the Leased Premises. *Id.*; *see also* ECF No. 53-2 at 3.

### B.  GNY and the Insurance Policy

GNY issued a commercial general liability insurance policy to CPA for a policy period of December 1, 2013 to December 1, 2014 ("2014 Policy") and renewed that policy for a successive policy period from December 1, 2014 to December 1, 2015 ("2015 Policy").  ECF No. 59 at 7 ¶ 9; ECF No. 63 at 1 ¶ 1.  CPA purchased the policies through Merit Insurance Agency ("Merit").  *Id.* ¶ 2.  The parties agree that the claim at issue fell within the 2015 Policy period.  ECF No. 59 at 9 ¶ 27.

### i.    The 2015 Policy

Under Coverage B, the 2015 Policy provided coverage to CPA for "Personal and Advertising Injury Liability."  *Id.* at 9 ¶ 24; ECF No. 53-15 at 133.  "Personal and advertising injury" is defined as "injury, including consequential 'bodily injury', arising out of one or more of the following offenses: … [t]he wrongful eviction from, wrongful entry into, or invasion of

the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor." ECF No. 59 at 9 ¶ 25; ECF No. 53-15 at 141. Under the 2015 Policy, GNY agreed to "pay sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this [policy] applies," had the "right and duty to defend the insured against any 'suit' seeking those damages," and reserved in its discretion the ability to "investigate any 'offense' and settle any claim or 'suit' that may result." *Id.* at 133. In addition, "[a] person or organization may sue [GNY] to recover on an agreed settlement or on a final judgment against an insured; but [GNY] will not be liable for damages that are not payable under the terms of this Coverage Part ...." ECF No. 59 at 9 ¶ 26; ECF No. 53-13 at 138.

The 2015 Policy also imposes the following notice requirements on the insured when an occurrence, offense, claim, or suit happens:

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

…

**2. Duties In The Event of Occurrence, Offense, Claim or Suit**

    **a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

        **1)** How, when and where the "occurrence" or offense took place;

        **2)** The names and addresses of any injured persons and witnesses; and

        **3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

    **b.** If a claim or "suit" is brought against any insured, you must:

        **1)** Immediately record the specifics of the claim or "suit" and the date received; and

    **2)** Notify us as soon as practicable.

    You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

    **1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

    **2)** Authorize us to obtain records and other information;

    **3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

    **4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

ECF No. 53-15 at 137–38.  A "suit" is defined as "a civil proceeding in which damages because of 'bodily injury', 'property damage' or 'personal and advertising injury' to which this insurance applies are alleged."  *Id.* at 142.

    i.    <u>CPA's Relationship with Merit</u>

GNY appointed Merit as its producer or broker[1] in Connecticut and had a compensation agreement with Merit.  ECF No. 59 at 10 ¶ 29; *see* ECF No. 53-16 at 5; ECF No. 53-8 at 4. Lucas Sheldon of GNY testified that GNY's "relationship is not directly with the insured" but "[i]t's with the [producer]."  ECF No. 53-16 at 4.  GNY had "an expectation … that the [insured] would report [a] claim to Merit" and that "Merit would then report the claim to GNY."[2]  ECF

---

[1] The parties appear to use the terms producer and broker interchangeably.  For the sake of consistency, I will use "producer" in this ruling.

[2] Citing Fuffo's deposition pages 24:17-20 and 88:22-89:6, GNY states that "[w]hile independent producers, such as Merit, typically reported claims to GNY, GNY relied on insureds to report claims to their producers, in accordance with the notice requirements in their policies."  ECF No. 59 at 10–11 ¶ 33; *see also id.* at 10 ¶¶ 30–32.  However, Fuffo's deposition docketed along with GNY's Local Rule 56(a)2 Statement does not

No. 53-16 at 8; ECF No. 59 at 10 ¶¶ 30, 32; *see also* ECF No. 53-8 at 5 (stating that "in most instances, … GNY … [relies] on the producer to provide notice of claims"). GNY expected to learn of lawsuits against insureds through the producers. ECF No. 59 at 10 ¶ 31; ECF No. 53-16 at 3. Producers typically report claims to GNY by email. ECF No. 53-8 at 4; ECF No. 59 at 11 ¶ 34. GNY provides different email addresses to producers for them to submit various types of claims. ECF No. 59 at 11 ¶ 35.

GNY instructed Merit on how to submit claims. *Id.* at 11 ¶ 36. Marlene Leja, a claims advocate and claims manager at Merit, stated that a "client would call [her] and report claims, and [she] would file them on behalf of the client." ECF No. 63-3 at 3–4. To report a claim, Merit would send "an ACORD form" to a particular email address at GNY designated for reporting the type of claim involved. ECF No. 53-11 at 10. Leja testified that while GNY's insurance policy directed the insured to report to GNY, Merit reported claims on behalf of the insured to GNY. ECF No. 53-11 at 12. Leja also stated that if clients of Merit called to report a claim, she would record the "gist of the conversation with the client" in the AMS system, which is Merit's claims handling software. ECF No. 63-3 at 7.

### C. The Damage to the Leased Premises and the Resulting Lawsuits

On September 12, 2013, heavy rainfall caused a downspout to become detached from a roof drain, flooding the Leased Premises ("2013 Flood"). ECF No. 59 at 3 ¶ 7; ECF No. 63 at 2 ¶ 4. The 2013 Flood forced the complete closure of REC's medical practice for six weeks and the closure of portions of the practice for many months. ECF No. 59 at 3 ¶ 7. After the 2013 Flood, Dr. Robbins withheld rent from CPA. *Id.* at 3 ¶ 8.

---

contain the pages cited to support that assertion. *See* ECF No. 59-3. After a review of the rest of the record, I can only find page 89 of Fuffo's deposition, ECF No. 63-2 at 20, which does not support the entirety of GNY's assertion.

Elena Spinelli of RDR submitted a claim "to Merit [] to then be submitted to [GNY]" for the property damage from the 2013 Flood.  No. 53-3 at 8; *see* ECF No. 59 at 4 ¶ 10; ECF No. 63 at 2–3 ¶ 5.  Spinelli asked the independent adjuster retained by GNY, *id.*, whether CPA had a "valid [business interruption] claim to present to GNY for loss of income" due to REC's withholding of rent after the 2013 Flood, ECF No. 63-4 at 2.  GNY made three payments to CPA regarding the 2013 Flood: (1) $25,000 on October 4, 2014 as an "advance payment for damages due [to] failed drain pipe," ECF No. 59-4 at 2, (2) $47,547.08 on December 11, 2013 for "damages due to failed drain pipe," ECF No. 59-5 at 2, and (3) $8,849.09 on July 2, 2014 for "loss of business income due to failed drain pipe," ECF No. 59-6 at 2.[3]  *See* ECF No. 63 at 3 ¶ 6.

While the business interruption claim was pending, on May 14, 2014, CPA sued Dr. Robbins to recover the unpaid rent ("2014 Lawsuit").  ECF No. 63 at 3 ¶ 7; ECF No. 59 at 5 ¶ 12; *see Com. Park Assocs., LLC v. Robbins Eye Care Ctr., P.C.*, No. FBTCV144052827S, 2018 WL 1278253 (Conn. Super. Ct. Feb. 6, 2018).  On August 12, 2014, Dr. Robbins filed an answer to the complaint and asserted counterclaims against CPA, seeking damages and alleging that "[s]ince late October 2013, the [Leased] Premises [had] sustained a series of subsequent floods caused by [CPA's] failure to rectify the conditions that caused the September 12, 2013 flood." ECF No. 63 at 4 ¶ 8; ECF No. 59-18 at 5.  Although the parties dispute whether CPA notified Merit or GNY of the existence of the counterclaims, it is undisputed that CPA did not send to Merit or GNY copies of the counterclaims or any other documents served on it in the 2014 Lawsuit.  ECF No. 63 at 4 ¶ 9; *see* ECF No. 59-14 at 3.  The first deposition in the 2014 Lawsuit was on February 12, 2016.  ECF No. 59 at 7 ¶ 18.

---

[3] Defendants dispute whether the loss of business income was caused exclusively by the failed drain pipe and instead argue that REC's withholding of rent was related to the "structure and maintenance" of the Leased Premises.  ECF No. 63 at 3 ¶ 6.  The reasons for GNY's three payments listed above are taken from the claim inquiry invoices.

On several occasions in the spring of 2015, the sewage system at the Leased Premises backed up and sewage water flooded the Leased Premises ("2015 Sewage Floods").  ECF No. 63 at 4 ¶ 10.  Spinelli testified that CPA did not submit any property damage claims to GNY related to the 2015 Sewage Floods because the insurance policy had a $2,500 or $5,000 deductible and the cost of the clean-up was not "exorbitant enough" to pursue a claim.  *Id.* at 5 ¶ 11; *see* ECF No. 59-2 at 6.  On May 8, 2015, Dr. Robbins served amended counterclaims on CPA in the 2014 Lawsuit, asserting new allegations arising from the 2015 Sewage Floods.  ECF No. 63 at 5 ¶ 12; *see* ECF No. 59-19 at 3.  Specifically, Dr. Robbins alleged that "the sewage drainage system … malfunctioned on numerous occasions, resulting in the toilets at the [Leased] Premises backing up with raw sewage" and that as a consequence of the "sewage system failure, bacterial particulates [had] been detected in the air of the [Leased] Premises, including the operating room facilities."  ECF No. 63 at 5 ¶ 13; *see* ECF No. 59-19 at 3.  CPA did not send copies of the amended counterclaims to Merit or GNY.  ECF No. 63 at 6 ¶ 14.

In January 2016, CPA's lawyer, Attorney Robert Russo, asked Robert Caldwell of Merit for copies of CPA's insurance policies.[4]  ECF No. 63 at 6 ¶ 15; ECF No. 59-13 at 5–6.  Caldwell directed Leja to send copies of CPA's insurance policies to Russo.  ECF No. 59-13 at 5; ECF No. 53-11 at 15–16.  On January 20, 2016, Leja sent a copy of CPA's insurance policies to Attorney Russo.  ECF No. 59-8 at 2; ECF No. 59 at 6 ¶ 16.  Caldwell did not recall why Attorney Russo asked for a copy of the policies, ECF 59-13 at 6, and Leja testified that Caldwell did not tell her why Attorney Russo asked for the policies, ECF No. 59-16 at 4; ECF No. 63 at 10–11 ¶ 31.

---

[4] The exact date that Attorney Russo contacted Caldwell is unclear from the record.

On September 9, 2016, REC filed a separate lawsuit against CPA and RDR for claims arising out of the 2013 Flood and the 2015 Sewage Floods ("2016 Lawsuit").  ECF No. 63 at 8 ¶ 20; *see* ECF No. 59-20.  CPA did not send Merit or GNY a copy of the complaint or any of the other documents served on it in the 2016 Lawsuit.  ECF No. 63 at 8 ¶ 21.  On October 25, 2016, the 2016 Lawsuit was consolidated with the 2014 Lawsuit ("Consolidated Lawsuit").  *Id.* at 8 ¶ 22; ECF No. 59 at 7–8 ¶ 20.  REC's claims in the 2016 Lawsuit were "based on the same facts as, and identical to, Dr. Robbins's amended counterclaim[s]."  ECF No. 59 at 7–8 ¶ 20.  According to Dr. Robbins, "[t]he settlement discussions and mediation were unsuccessful and the cases could not be settled" for multiple reasons, including that REC was not willing to settle unless CPA paid REC a "substantial amount of money" and waived its claim against REC, and CPA refused to settle unless REC paid CPA back rent, which REC did not believe it owed.  ECF No. 63-7 at 3; ECF No. 63 at 17–18 ¶ 20.

On April 7, 2017, Spinelli emailed Merit, "request[ing] 'loss runs' on this account" and stating that "[j]ust f.y.i, there [was] a lawsuit pending on this" and that she believed that "this account [would] not be renewed by GNY."  ECF No. 59 at 8 ¶ 22; *see* ECF No. 53-14 at 2.  Spinelli testified that she requested the "loss runs" to be "proactive" for the upcoming renewal of the policy and that she was concerned that GNY might not renew the policy because of the "number of incidents that [had] occurred in a specific time frame."  ECF No. 59-2 at 9–10; ECF No. 63 at 9 ¶¶ 24–25.  She also testified that the pending lawsuit she referenced to in the April 7, 2017 email was the action between REC and CPA.  ECF No. 59-2 at 9.  Caldwell responded that he would "absolutely order the loss runs for you."  ECF No. 53-14 at 2.

The Consolidated Lawsuit was tried before the Connecticut Superior Court in July 2017, *Com. Park Assocs., LLC v. Robbins*, 193 Conn. App. 697, 712 (2019), and on February 2, 2018,

the court issued a ruling, finding that CPA was responsible for the sewer problems and floods in the spring of 2015, ECF No. 53-2 at 15, and that the 2015 Sewage Floods "constructively evicted Robbins" from the Leased Premises, ECF No. 53-2 at 13; ECF No. 59 at 2 ¶ 2.  The court awarded $899,100 in damages to REC, which was increased to $958,041.92 after the court granted REC's motion for reconsideration.  ECF No. 59 at 2 ¶ 3.  On March 5, 2018, the court also awarded REC post-judgment interest of eight percent per annum starting February 6, 2018. *Id.* at 3 ¶ 6.

After the Connecticut Superior Court's ruling, on May 22, 2018, Attorney Russo emailed Caldwell asking whether CPA had ever submitted a claim for the 2015 Sewage Floods.  ECF No. 63 at 10 ¶ 27; *see* ECF No. 59-9 at 2.  Caldwell forwarded Attorney Russo's email to Leja and asked her to "check into this."  ECF No. 63 at 10 ¶ 28; ECF No. 59-10 at 3.  Leja responded to Caldwell with the following:

> No claim was ever filed by Commerce Park for water damage and I remember from my sister who worked there that there was substantial damage to her location....back in January 2016 you requested I send a copy of the commerce park policy to Rob Russo, which I did and I have a note in the system saying **email to insd's atty with copy of polices; no claim at this time; Dr Robbins suing them- she didn't pay her rent**

*Id.* (emphasis in original).[5]  Leja testified that the "system" referenced in her email was the AMS system.  ECF No. 53-11 at 23.  She prepared her response to Caldwell's inquiry by reviewing documents and emails, *id.* at 21, but she did not recall whether she had entered the note into the

---

[5] GNY objects to the consideration of the note, arguing that it is hearsay and unreliable.  ECF No. 59 at 7 ¶ 17.  Specifically, GNY points out that the note was not produced in discovery and the only record of the note is in Leja's 2018 email.  *Id.*  I find that Leja's description of the note is hearsay to the extent that it is being offered to prove the truth of the matter asserted—*i.e.*, that someone emailed the insured's attorney a copy of the policies, that there was no claim at that time, and that Dr. Robbins sued CPA.  *See Roberts v. Azize*, 767 F. App'x 196, 199 (2d Cir. 2019) ("A statement is only hearsay if 'a party offers [it] to prove the truth of the matter asserted in the statement.'" (alteration in original) (quoting Fed. R. Evid. 801(c)(2))).  I may consider Leja's description of the note, however, as evidence that Merit knew about Dr. Robbins's lawsuit because that is a non-hearsay use of the evidence. *See United States v. Dupree*, 706 F.3d 131, 137 (2d Cir. 2013) (noting a "statement is not hearsay where, as here, it is offered, not for its truth, but to show that a listener was put on notice").

AMS system, *id.* at 23–24.  Leja further testified that the "email to [insured's] attorney with copy of policies" referred to her email to Attorney Russo in January 2016, *id.* at 24–25, and that the note was "the type of information [she] would input into a client file as part of [her] duties and responsibilities as the claims advocate/claims manager," ECF No. 63-3 at 19–20.  After receiving Leja's email, Caldwell responded to Attorney Russo that he received a "request back in 2016 to send copies of the policies to [him]" but that "[t]here was never a request to put a claim in." ECF No. 59-9 at 2.

Michael Fuffo of GNY testified that GNY learned that CPA was suing Robbins "sometime after" GNY received a "correspondence" dated June 22, 2018.  ECF No. 63-2 at 5; ECF No. 63 at 12 ¶ 35.  On July 2, 2018, Fuffo emailed Leja with correspondence that he "received from Ziesler & Zeisler, P.C. on behalf of [REC] relating to the significant judgment they obtained against [CPA]."  ECF No. 59-11 at 2.  Further, Fuffo wrote that "receipt of this correspondence was GNY's first notice of this lawsuit" and he requested that Leja provide a summary of what Caldwell and Attorney Russo discussed back in May 2018.  *Id.*; ECF No. 63 at 12 ¶ 36.  Leja then emailed Caldwell the following:

> Got a call from GNY claims manager regarding a claim being filed for Commerce Park. Apparently, the tenant (Robbins Eye center) brought suit against the insured. Neither GNY nor Merit ever received the suit. Apparently the insureds attorney Robert Russo has been defending them in this matter. Well now an award has been made on the suit to the claimant, Robbins Eye Center for a million dollars against our insured. GNY had no knowledge of the claim at all. I mentioned to the adjuster that Russo had inquired with us back in May about a claim and I do not know what conversation you had with Russo (see my email to you below). We need to know what was said to the attorney regarding the claim etc. The adjuster wants us to email him with those details. Since I wasnt a part of the conversation with Atty Russo, it likely needs to come from you. There has been liens put on the insureds properties, etc. and right now the matter is up for appeal however that judgement was made for 1 million. Russo has been defending the insured right along but no one notified GNY or us about the suit or filing a claim officially that Im aware of!

ECF No. 59-10 at 2; ECF No. 63 at 12 ¶ 37.  Caldwell responded that his conversation with

Russo was "concise" and that Attorney Russo "asked for a copy of the policy language that

would apply to water damage" but "[n]o interpretation of the claim was given whatsoever."  ECF

No. 59-10 at 2.

REC and CPA appealed the Connecticut Superior Court's ruling.  *See Com. Park Assocs.,*

*LLC*, 193 Conn. App. at 702.  On appeal, the Connecticut Appellate Court reduced REC's

damages award to $741,847.34.  ECF No. 59 at 3 ¶ 4; *see Com. Park Assocs., LLC*, 193 Conn.

App. at 745–46.  On February 7, 2020, judgment was entered for REC for a principal amount of

$744,093.16.  ECF No. 59 at 3 ¶ 5.  As noted above, REC's judgment fell within the 2015 Policy

period.  *Id.* at 9 ¶ 27.

GNY did not assist in or fund CPA's appeal.  ECF No. 63-2 at 14; ECF No. 63 at 18 ¶ 22.

Fuffo testified that he was not aware of anything "that would have prevented GNY from funding

[CPA's] appeal while at the same time reserving rights as to liability," and that GNY did not

"feel it was warranted" to assist CPA on appeal.  ECF No. 63-2 at 15.  Fuffo also testified that it

appeared to him that CPA's counsel did a "reasonable job," ECF No. 63-2 at 18, that he could

not identify a witness or expert that CPA's counsel should have deposed, called at trial, or

retained, *id.* at 16–18, and that he did not know whether any evidence was lost or spoliated as a

result of the CPA's allegedly late notice, *id.* at 13.  *See* ECF No. 63 at 17 ¶¶ 15–19.  Fuffo

testified, however, that, as a result of CPA's allegedly untimely notification, GNY was

prejudiced because it was "deprived of the opportunity to retain our own defense counsel" and

"experts," "to evaluate the claim," to "control the litigation, and "to bring a [declaratory

judgment] action in conjunction with the underlying trial."  ECF No. 63-2 at 15; ECF No. 63 at

14 ¶ 42; *see also* ECF No. 59-17 at 4 (GNY stated, in response to an interrogatory, "that it was

materially prejudiced by the lack of timely notice of REC's claims against CPA because it was deprived of the opportunity to, among other things, investigate the claims and property at issue in those claims; investigate witnesses; engage in pleadings; engage in discovery; obtain demonstrative evidence; identify and retain experts; select defense counsel; control the defense strategy; control the settlement strategy; engage in settlement discussions and defend the case at trial").

CPA admitted that "[it] did not notify GNY in writing of the *CPA v. Robbins* lawsuit prior to June 22, 2018," ECF No. 59-14 at 3; ECF No. 63 at 12–13 ¶ 39, but REC argues that CPA notified Merit, "GNY's agent for receiving claims," pointing to the note in the AMS system, *id.*; *see also* ECF No. 59-10 at 3.  Spinelli testified that she believed that she "did not mail a copy of the summons to GNY," ECF No. 59-2 at 9–10, and that she did not "submit[] a claim regarding the lawsuit to GNY in the fall of 2016," *id.* at 8.  She also testified that she did not recall if she notified GNY but that if she did not notify GNY, it would have been a "grave error."  *Id.* at 7; ECF No. 63 at 13–14 ¶ 41.

## II.    PROCEDURAL HISTORY

On November 5, 2019, GNY filed suit against REC, Dr. Robbins, CPA, and RDR seeking a declaratory judgment that there is no coverage under the insurance policies for the judgment from the Consolidated Lawsuit.  ECF No. 1 ¶ 1.  GNY brings multiple claims alleging that coverage is barred.  Under Count I, GNY claims that CPA failed to comply with the notice requirements of the insurance policies, barring coverage.  *Id.* ¶¶ 60–63.  Under Count VIII, GNY claims that the Fungi or Bacteria Exclusion excludes coverage for "property damage" as a result of "fungi" or "bacteria."  *Id.* ¶¶ 85–86.  Dr. Robbins and REC brought counterclaims against GNY for breach of contract and unjust enrichment for GNY's failure to pay the judgment from

the Consolidated Lawsuit.  ECF No. 24 at 15–16.  Dr. Robbins and REC alleged that the 2015

Policy provided coverage to CPA for "Personal and Advertising Injury," *id.* ¶¶ 26–31, which is

found under Coverage B of the 2015 Policy.  On March 17, 2022, GNY filed a motion to dismiss

REC's and Dr. Robbins's unjust enrichment counterclaim, ECF No. 33, which I granted, ECF

No. 49.

On March 10, 2021, REC moved for summary judgment on its remaining counterclaim

for breach of contract and on Counts I, IV, VI, and VIII of GNY's complaint.  ECF No. 52-1 at

1.  GNY cross-moved for summary judgment on REC's breach of contract claim and Counts I

through VIII of its complaint.  ECF No. 57.  GNY also moved to amend Count VIII of its

complaint to clarify that it seeks a declaration that the Fungi Bacteria Exclusion endorsement

excludes coverage under Coverage B (in addition to Coverage A) and to withdraw Counts II, III,

V, VI, and X from its complaint because GNY is no longer pursuing those claims.  ECF No. 66-1

at 1, 3.

## III.    LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine

issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v.*

*Cotton*, 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted).  In

reviewing the summary judgment record, a court must "construe the facts in the light most

favorable to the non-moving party and must resolve all ambiguities and draw all reasonable

inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir.

2013).  "A genuine dispute of material fact exists for summary judgment purposes where the

evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable

jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d

Cir. 2013).  The moving party bears the burden of demonstrating that no genuine issue exists as

to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  If the moving party

carries its burden, "the opposing party must come forward with specific evidence demonstrating

the existence of a genuine dispute of material fact."  *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358

(2d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## IV.    DISCUSSION

In its motion for summary judgment, REC argues that (1) GNY breached the 2015 Policy

by refusing to pay the judgment resulting from the Consolidated Lawsuit, ECF No. 52-1 at 7–8,

(2) CPA provided notice of the lawsuits to Merit, which REC argues was "GNY's agent for the

receipt of notice of losses or claims from the insured[s] and the transmitting of such notice to

GNY," *id.* at 11, and (3) no other exclusions, including the Fungi and Bacteria Exclusion,

preclude coverage, *id.* at 16–17.  GNY counters that it is entitled to summary judgment on its

claims and REC's counterclaim because (1) CPA failed to comply with the 2015 Policy's notice

requirements and that failure materially prejudiced GNY, ECF No. 58 at 25, 33, and (2) coverage

is excluded by the Fungi or Bacteria Exclusion, *id.* at 35–40.  Because I find that CPA failed to

comply with the 2015 Policy's notice requirements and that CPA's failure materially prejudiced

GNY, I grant summary judgment in favor of GNY as to Count I of its complaint and REC's

remaining counterclaim for breach of contract.  The remaining counts are dismissed as moot.

### A.  There is a Genuine Dispute of Material Fact as to Whether Merit was GNY's Agent

REC argues that GNY and Merit had an agency relationship because GNY clearly

manifested that Merit would receive claims on behalf of GNY, Merit accepted its responsibility

for receiving claims from insureds, and GNY was in control of its relationship with Merit.  ECF

No. 52-1 at 11–12.  Specifically, REC points to evidence that "Merit was GNY's agent for the

receipt of notice of losses or claims from insured[s] and the transmitting of such notice to GNY," GNY had an "expectation" that the insured would report a claim to Merit, GNY usually received notice of any claims from the producer, GNY dictated how producers, such as Merit, should report claims, and Merit understood it was responsible for receiving claims from insureds on GNY's behalf. *Id.* at 11–13. Therefore, REC argues, any notice to Merit would suffice as notice to GNY. *Id.* at 13; *see also* ECF No. 62 at 8–9 (stating that notice to the agent is notice to the principal).

GNY denies that a principal-agent relationship exists between it and Merit and argues that "[t]he mere fact that [it] permits (but does not require) independent producers (like Merit) to submit claims on their clients' behalf … does [not] create a princip[al]-agent relationship between GNY and the independent producers that sell its policies." ECF No. 65 at 6. GNY also contends that producers sell policies from other insurers and owe fiduciary duties to their clients, such as CPA, and not the insurers. *Id.* at 6–7. After reviewing the evidence in the record, I conclude that there is a genuine dispute of material fact as to whether Merit was GNY's agent.

Under Connecticut law, "[a]gency is defined as the fiduciary relationship which results from manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Beckenstein v. Potter & Carrier, Inc.*, 191 Conn. 120, 132, 464 A.2d 6, 13 (1983) (internal quotation marks and citations omitted). "[I]t is a general rule of agency law that the principal in an agency relationship is bound by, and liable for, the acts in which his agent engages with authority from the principal, and within the scope of the agent's employment." *Maharishi Sch. Vedic Scis., Inc. v. Connecticut Const. Assocs. Ltd. P'ship*, 260 Conn. 598, 606 (2002). "[T]he three elements required to show the existence of an agency relationship include: (1) a manifestation by the principal that the agent

will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking." *Beckenstein*, 191 Conn. at 133 (citation omitted).

"An agent's authority may be actual or apparent. … Actual authority may be express or implied." *Gordon v. Tobias*, 262 Conn. 844, 849–50 (2003) (internal quotation marks and citation omitted). "Evidence of express actual authority requires direct evidence that the principal authorized the agent to act, the agent agreed to the undertaking and the principal remained in control of the transaction." *Jimdee, LLC v. Flanagan Assocs.*, No. CV095030686S, 2010 WL 5610889, at *2 (Conn. Super. Ct. Dec. 17, 2010). "Implied authority is actual authority circumstantially proved. It is the authority which the principal intended his agent to possess.... Implied authority is a fact to be proven by deductions or inferences from the manifestations of consent of the principal and from the acts of the principal and [the] agent." *Gordon*, 262 Conn. at 50 (citation omitted).

"The existence of an agency relationship is a question of fact." *Beckenstein*, 191 Conn. at 133. In assessing whether an agency relationship exists, courts may consider "whether the alleged principal has the right to direct and control the work of the agent; whether the agent is engaged in a distinct occupation; whether the principal or the agent supplies the 'instrumentalities, tools, and the place of work'; and the method of paying the agent." *Id.* (citing Restatement (Second) 1 Agency §§ 13, 220). Further, "the labels used by the parties in referring to their relationship are not determinative; rather, a court must look to the operative terms of their agreement or understanding." *Id.* (internal quotation marks and citation omitted).

Here, Merit served as GNY's producer or broker in Connecticut and GNY had the expectation that insureds would report claims to Merit, who would then report claims to GNY.

16

GNY instructed producers, including Merit, as to how to report the claims.  Specifically, GNY

provided particular email addresses to which producers were to submit particular types of claims.

Leja testified that when clients called Merit with claims, she reported those claims to GNY.

Based on this evidence, a reasonable juror could find that Merit was GNY's agent for the

purposes of receiving claims because GNY expected that Merit would report claims, GNY

instructed Merit on how to report claims, and Merit accepted that responsibility by reporting

insureds' claims to GNY.  Therefore, I conclude that there is a genuine dispute of material fact as

to whether Merit was GNY's agent and thus as to whether notice to Merit amounted to notice to

GNY.

## B.  CPA Failed to Satisfy the 2015 Policy's Notice Requirements

The 2015 Policy requires CPA to "see to it that [GNY] receive[s] written notice of the

claim or 'suit' as soon as practicable."  ECF No. 53-15 at 138.  Further, the 2015 Policy requires

CPA to "[i]mmediately send [GNY] copies of any demands, notices, summonses or legal papers

received in connection with the claim or 'suit.'"  *Id.*

"The purpose of a policy provision requiring the insured to give the company prompt

notice of an accident or claim is to give the insurer an opportunity to make a timely and adequate

investigation of all the circumstances.... And further, if the insurer is thus given the opportunity

for a timely investigation, reasonable compromises and settlements may be made, thereby

avoiding prolonged and unnecessary litigation."  *Aetna Cas. & Sur. Co. v. Murphy*, 206 Conn.

409, 417 (1988), *overruled on other grounds by Arrowood Indem. Co. v. King*, 304 Conn. 179

(2012) (citation omitted) ("*Arrowood*").  Under Connecticut law, two conditions must be

"satisfied before an insurer's duties can be discharged pursuant to the 'notice' provision of a

policy: (1) an unexcused, unreasonable delay in notification by the insured; and (2) resulting

material prejudice to the insurer." *Arrowood*, 304 Conn. at 198 (citation omitted).  Elaborating

on the first condition, Connecticut courts have held that "[a]n insured is required to provide

notice of a claim against it in the manner in which the policy requires." *Ellis v. Cty. Agency,*

*Inc.*, No. CV146017155S, 2017 WL 1238457, at *2 (Conn. Super. Ct. Jan. 23, 2017) ("*Ellis*

*I*"), *aff'd on reh'g*, *Ellis v. Cty. Agency, Inc.*, No. CV146017155S, 2017 WL 3011674 (Conn.

Super. Ct. May 25, 2017) ("*Ellis II*").  Nonetheless, the Connecticut Supreme Court has

interpreted the phrase, "as soon as practicable" or "immediately" in notice provisions to mean

"as soon as can reasonably be expected under the circumstances. … The duty to give notice does

not arise unless and until facts develop which would suggest to a person of ordinary and

reasonable prudence that liability may have been incurred, and is complied with if notice is given

within a reasonable time after the situation so assumes an aspect suggestive of a possible claim

for damage." *Arrowood*, 304 Conn. at 199 (citation omitted); *City of West Haven v. U. S. Fid. &*

*Guar. Co.*, 174 Conn. 392, 397 (1978) ("[P]olicy provisions employing terms such as

'immediately' … are generally construed as requiring only that notice be given within a

reasonable time, under the circumstances of the particular case.").

     The second condition, proof of material prejudice, is intended to avoid "disproportionate

forfeiture" as a result of a "rigid application of the general rule discharging an insurer's liability

when an insured has failed to comply with the notice provisions of the policy." *Arrowood*, 304

Conn. at 201–02.  In *Arrowood*, the Connecticut Supreme Court placed the burden of proving

prejudice on the insurer.  *Id.* at 202–03.

     REC argues that CPA's counsel, Attorney Russo, gave the requisite notice to Merit in

January 2016, pointing to evidence that "[i]n January, Merit entered a note into … AMS, stating:

'**email to insd's atty with copy of polices; no claim at this time; Dr Robbins suing them- she**

**didn't pay her rent**.”  ECF No. 52-1 at 13 (emphasis in original).  This notice was given, REC argues, before a single deposition had occurred in the 2014 Lawsuit and before REC filed the 2016 Lawsuit.  *Id.*  REC also argues that Spinelli also provided notice on April 7, 2017 in her email to Merit in which she wrote that “there is a lawsuit pending.”  *Id.* at 14.  Based on those two events, REC argues that “GNY … received prompt notice of REC’s claims.”  *Id.*

GNY counters that CPA did not satisfy the 2015 Policy’s notice requirements because it failed to provide any written notice or to send copies of the demands, notices, summonses, or any legal papers received in connection with Dr Robbins’s counterclaims and 2016 Lawsuit.  ECF No. 58 at 25.  GNY argues that CPA’s duty to provide notice was triggered on three occasions: (1) when Dr. Robbins served counterclaims against CPA in the 2014 Lawsuit on August 14, 2014; (2) when Dr. Robbins served amended counterclaims on CPA in the 2014 Lawsuit on May 5, 2015; and (3) when REC served the complaint and summons on CPA in the 2016 Lawsuit on GNY on September 9, 2016.  *Id.* at 26–27.  GNY points to evidence that CPA never provided GNY with written notification of lawsuits and never sent copies of the legal papers received in connection with the counterclaims and the 2016 Lawsuit to GNY.  *Id.* at 27.  Further, GNY argues that the January 2016 phone call was insufficient because (1) it was an oral communication, (2) the evidence does not support a finding that Attorney Russo mentioned the 2014 Lawsuit during the phone call, and (3) it happened sixteen months after Dr. Robbins filed her initial counterclaims, failing to comply with the insurance policies’ requirement for notice “as soon as practicable.”  *Id.* at 28–30.  Similarly, GNY argues that the April 7, 2017 email came months after the filing of the 2016 Lawsuit, and thus was not notice “as soon as practicable,” and also failed to attach copies of the legal papers.  *Id.* at 32–33.

I conclude that CPA failed to comply with the notice requirements of the 2015 Policy for three independent reasons: (1) there is no evidence that in January 2016, Attorney Russo notified Merit that CPA intended to file a claim related to the counterclaims, (2) CPA failed to give notice in writing and failed to give notice "as soon as practicable," and (3) CPA failed to send copies of the summonses, pleadings, and any other legal papers associated with the counterclaims and lawsuits to Merit or GNY.

i.   The January 2016 Call

REC argues that Attorney Russo notified Merit of Dr. Robbins's claims against CPA during his January 2016 phone call with Caldwell.  ECF No. 52-1 at 15.  I find that the January 2016 phone call did not constitute notice of a claim under the 2015 Policy.

In January 2016, Attorney Russo called Caldwell for copies of CPA's insurance policies. Caldwell asked Leja to send copies of the insurance policies to Attorney Russo, which she did on January 20, 2016.  Caldwell recalls only that Attorney Russo asked for the policies, and Leja testified that Caldwell did not tell her why Attorney Russo asked for the policies.  Then, on May 22, 2018, Attorney Russo emailed Caldwell asking whether CPA had submitted a claim for the 2015 Sewage Floods.  Caldwell asked Leja to "check into this," to which Leja responded that "[n]o claim was ever filed" and that she found a note in the AMS system stating "**email to insd's atty with copy of polices; no claim at this time; Dr Robbins suing them- she didn't pay her rent**."  Leja testified that the email referenced in the note was her January 20, 2016 email to Attorney Russo.  She also testified that she did not recall whether she entered that note into the AMS system but that the note was the "the type of information [she] would input into a client file as part of [her] duties and responsibilities as the claims advocate/claims manager."  Caldwell responded to Attorney Russo, stating that "[t]here was never a request to put a claim in."

The note referenced in Leja's 2018 email is the only evidence that REC submits that Attorney Russo told Caldwell about the lawsuit.  But there is no evidence of when this note was recorded in the AMS system and the text of the note does not suggest that it describes Attorney Russo's January 2016 call.  And even if a reasonable juror could conclude that the note was entered in January 2016 and that it did describe Attorney Russo's call to Caldwell, the note is not notice of a claim because, at best for REC, it suggests that Attorney Russo stated that "Dr. Robbins [was] suing them" but that CPA did *not* seek to file any "claims at [that] time."  When drawing all reasonable inferences in REC's favor, I find that while the note shows that Merit might have known about the existence of Dr. Robbins's counterclaims, it had no reason to believe that CPA was making any claims related to that lawsuit and, therefore, had no reason to notify GNY of a claim.  The 2018 note referenced to in Leja's 2018 email, then, did not amount to notice of a claim under the 2015 Policy.

ii.      Notice in Writing and Notice "As Soon As Practicable"

REC argues that CPA gave "prompt notice" of REC's claims when (1) Attorney Russo called Caldwell in January 2016 and (2) Spinelli emailed Merit stating that "there is a lawsuit pending" on April 7, 2017.  ECF No. at 52-1 at 13–14.  I disagree.

CPA had a duty to give notice in writing as soon as (1) Dr. Robbins served her first counterclaims in 2014, (2) Dr. Robbins served her Amended Counterclaim in 2016, and (3) REC sued CPA in 2016.  This is because "a reasonably prudent person would have understood that liability might be incurred" when a counterclaim or a lawsuit is filed against that person.  *See Zahoruiko v. Fed. Ins. Co.*, 717 F. App'x 50, 52 (2d Cir. 2018) (stating that insured had a duty to give notice when he was sued); *Jazlowiecki v. Nationwide Ins. Co. of Am.*, No. HHDCV126036618S, 2014 WL 4746527, at *6 (Conn. Super. Ct. Aug. 8, 2014) ("[T]he duty to

provide notice arose, at minimum, in December 2008 when the counterclaim was formally served on the [insured].").

Even if, contrary to my finding above, Attorney Russo's January 2016 phone call gave notice of a claim, the phone call would still not constitute proper notice under the 2015 Policy because it was not in writing and because it was too late.  First, as GNY points out, the 2015 Policy requires the notice to be in writing.  ECF No. 58 at 28.  REC argues that "GNY's policy and course of dealing with its insured … permitted the insured to provide notice of potential claims to GNY orally through Merit and Merit would create a written record," ECF No. 62 at 9, but it cites no evidence suggestive of any course of dealing by which GNY waived or agreed to amend the written notice requirement of the 2015 Policy.  The 2015 Policy requires the insured to provide written notice of the "claim or 'suit'" and does not contemplate a written entry made by the insurer's agent following oral notice by the insured.  Connecticut courts have held that "[a]n insured is required to provide notice of a claim against it in the manner in which the policy requires."  *Ellis I*, 2017 WL 1238457, at *2; *see Johnson v. Connecticut Ins. Guaranty Ass'n,* 302 Conn. 639, 643 (2011) ("[C]onstruction of a contract of insurance presents a question of law for the court ... An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract ... If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning." (internal quotation marks omitted)).  In addition, courts applying Connecticut law have found that oral notice does not satisfy an insurance policy's written notice requirement.  *See Dorchinsky v. Windsor Ins. Co.*, 90 Conn. App. 557, 560–561 (2005) (affirming summary judgment for insurer when the insured called her insurance agent immediately after an accident to notify it of the accident and sent repair estimate and police

report to the agent but "[t]he policy plainly require[d] written notice of a claim for underinsured

motorist benefits");[6] *Ellis II*, 2017 WL 3011674, at *3 (holding that there was no genuine dispute

of material fact that precludes summary judgment in favor of the insurer where the insured called

the insurer but the insurance policy required the insured to provide "written notice and [to]

forward the suit papers" to the insurer); *Main Street*, 2022 WL 43866, at *10 (holding that an

insured's call to the insurance agent a month after the insured received a summons and complaint

was insufficient to meet his obligations under the insurance policy, which required written notice

and for the insured to send documents of the lawsuit to the insured).

Second, Attorney Russo's January 2016 phone was untimely. The phone call happened

seventeen months after Dr. Robbins's first counterclaim and eight months after Dr. Robbins's

amended counterclaims. Therefore, if it was notice of a claim at all, it was not notice "as soon as

can reasonably be expected under the circumstances." *See Jazlowiecki*, 2014 WL 4746527, at

---

[6] REC argues that GNY's reliance on *Dorchinsky* is faulty because those cases "are premised upon a legal standard that the Connecticut Supreme Court has expressly held inapplicable" to the notice issue in this case. ECF No. 62 at 10. Specifically, REC argues that this case concerns the obligation of an insured to provide "notice of [an] occurrence 'as soon as practicable'" but *Dorchinsky* applies to a "contractually based requirement that tracked Conn. Gen. Stat. 38a-336(g)(1)" about uninsured or underinsured motorist coverage. *Id.* I disagree with the notion that *Dorchinsky* does not provide useful guidance here.

In *Dorchinsky*, the plaintiff sought to recover underinsured motorist benefits under a policy that allowed the insured to toll the policy's limitation period only if the insured notified the insurer in writing of claims for underinsured motorist benefits within the applicable limitation period. 90 Conn. App. at 558, 560. As described above, the *Dorchinsky* court held that the insured failed to give adequate notice when she called her insurance agent immediately after an accident and later sent documentation to an agent because the policy required written notice specifically of a claim for underinsured motorist benefits. *Id.* at 560–61. The Connecticut Supreme Court in *Voris v. Middlesex Mut. Assur. Co.*, 297 Conn. 589, 598–600 (2010), held that insureds must strictly comply with the notice provisions for tolling limitation periods. Further, the *Voris* court states that "absence of prejudice" to an insurer would not excuse the insured's non-compliance with such notice provisions, because such provisions are aimed at "preventing surprises through the revival of state claims," unlike notice of occurrence or notice of suit provisions, which are aimed at "safeguard[ing] the insurer from prejudice in processing the claim." *Id.* at 599–600.

The difference between notice of occurrence/suit provisions and notice of tolling limitation provisions is that enforcing the former requires proof of prejudice to the insurer while enforcing the latter does not. But both types of provisions—and the lines of cases interpreting both—require, at least as a first step, compliance by the insured with the requirement of giving notice. *See Ellis I*, 2017 WL 1238457, at *2 ("An insured is required to provide notice of a claim against it in the manner in which the policy requires."). Thus, *Dorchinsky*'s notice analysis, which required the insured to follow the policy's requirements, is still applicable here. I will analyze below whether GNY has been prejudiced under the standard set forth in *Arrowood*.

*5–6 (finding that the insured violated the requirement that he provide notice "as soon as practical" "by waiting for *ten months* before giving notice on the eve of trial" (emphasis in original)); *Zahoruiko v. Fed. Ins. Co.*, No. 3:15-CV-474 (VLB), 2017 WL 776645, at *6 (D. Conn. Feb. 28, 2017), *aff'd*, 717 F. App'x 50 (2d Cir. 2018) (finding the insured's notice was untimely when the insured did not give notice until sixteen months after being served with a complaint).  REC continues to argue, however, that the January 2016 phone call happened months before REC filed the 2016 Lawsuit, which was based on the "same facts and occurrence as the amended counterclaims in the 2014 Action."  ECF No. 52-1 at 13–14.  But this argument misses the point that CPA had a duty to give notice as soon as Dr. Robbins filed her counterclaims.

Spinelli's 2017 email was also untimely.  Spinelli sent the email, which mentioned the lawsuit but did not suggest that CPA was seeking to make an insurance claim, two years and eight months after Dr. Robbins's initial counterclaims, one year and eleven months after Dr. Robbins's amended counterclaims, and seven months after REC's filing of the 2016 Lawsuit.  Thus, even if it was notice of a claim, Spinelli's email was not sent "as soon as can reasonably be expected under the circumstances."

### iii.   Copies of the Summonses, Pleadings, and Other Legal Papers

CPA also failed to comply with the 2015 Policy by neglecting to send copies of any demands, notices, summonses, or legal papers received in connection with the claim or suit.  ECF No. 58 at 27.  The 2015 Policy required CPA to "[i]mmediately send [GNY] copies of any demands, notices, summonses or legal papers received in connection with the claim or 'suit.'"  And as stated above, CPA's duty to give notice was triggered when (1) Dr. Robbins served her first counterclaims in 2014, (2) Dr. Robbins served her amended counterclaims in 2016, and (3)

REC sued CPA in 2016.  It is undisputed that no one sent Merit or GNY copies of the pleadings, summonses, or any other legal papers in connection with the counterclaims or lawsuits.  Therefore, I find that CPA failed to comply with the 2015 Policy's notice requirements by neglecting to send copies of the pleadings, summonses, and other legal papers related to the counterclaims and the 2016 Lawsuit.

## C. CPA's Failure to Give Proper Notice Materially Prejudiced GNY

As discussed above, to be discharged from its coverage obligations due to its insured's failure to comply with the 2015 Policy's notice provisions, GNY must show that those failures materially prejudiced it.  GNY argues that they did because they deprived it "of the opportunity to, among other things, investigate the claims and property at issue in those claims; investigate witnesses; engage in pleadings; engage in discovery; obtain demonstrative evidence; identify and retain experts; select defense counsel; control the defense strategy; control the settlement strategy; engage in settlement discussions and defend the case at trial."  ECF No. 58 at 33.  REC counters that Merit and, therefore, GNY, knew about the lawsuit as early as January 2016 and at that time "depositions had not begun in the 2014 [Lawsuit] …, the 2016 [Lawsuit] had not been filed and the consolidated trial of the 2014 and 2016 [Lawsuits] did not begin until July, 2017." ECF No. 62 at 16.  Further, REC contends that even if GNY did not receive notice until 2018, it was still not prejudiced because (1) it cannot point to specific litigation strategy that it would have changed, *i.e.*, deposing different witnesses or retaining a different expert, (2) it does not know of any evidence that was spoliated as a result of the allegedly late notice, and (3) the case could not be settled.  *Id.* at 16–17.  REC also points out that GNY declined to participate in the appeal.  *Id.* at 17.  I agree with GNY.

An insurer may be prejudiced if the late or insufficient notice deprived the insurer of an "opportunity for a timely investigation," and to make " reasonable compromises and settlements" to avoid "prolonged and unnecessary litigation." *Hartford Ins. Co. v. Colonia Ins. Co.*, 58 Conn. App. 39, 44 (2000) (quoting *Aetna Casualty & Surety Co.*, 206 Conn. at 417).[7]  As noted, "[t]he insurer bears the burden of proving, by a preponderance of evidence, that it has been prejudiced by the insured's failure to comply with a notice provision." *Arrowood*, 304 Conn. at 201.

First, GNY was prejudiced by CPA's failure to provide written notice and to send copies of the pleadings and summonses.  "Provisions in insurance contracts specifying that notice must be written and accompanied by copies of relevant legal documents – as opposed to provided orally over the phone – are essential in that they optimize 'the [insurer's] ability to determine whether coverage applie[s] and to prevent loss ... to the [insured].'" *Main St. Am. Assurance Co.*, 2022 WL 43866, at *12 (quoting *Chicago Title Ins. Co. v. Bristol Heights Assocs.*, LLC, 142 Conn. App. 390, 409 (2013)).  Thus, "the manner of notice is no mere technicality; rather, it protects the capacity of the insurer to access all information related to a potential claim, and act accordingly to protect both it and the insured's interests in a timely fashion." *Id.*  CPA's failure to provide written notice along with the complaint and other legal papers associated with the lawsuit deprived GNY of the opportunity to determine whether the counterclaims were covered under the 2015 Policy and an opportunity to act on the potential claim.  Any passing references to the lawsuit—in the January 2016 phone call or in Spinelli's 2017 email— simply did not

---

[7] *Arrowood* overruled *Aetna* "to the extent that it allocated the burden to the insured to disprove prejudice" and instead, held "that the insurer bears the burden of proving, by a preponderance of evidence, that it has been prejudiced by the insured's failure to comply with a notice provision." *Arrowood*, 304 Conn. at 201.  Therefore, the discussions of what constitutes prejudice to insurers in cases that predated *Arrowood* are still good law. *Id.*; *see also Ellis II*, 2017 WL 3011674, at *3 n.4 (stating that "factors in defining prejudice" discussed in case law predating *Arrowood* "are still valid").

allow GNY to "access all information … and act accordingly to protect it and the insured's interest in a timely fashion."

Second, in any event, by the time it learned of the lawsuits, GNY was materially prejudiced. According to Fuffo, GNY first learned of the lawsuits "sometime after" June 22, 2018. By then, the Connecticut Superior Court already had rendered judgment in the Consolidated Lawsuit. Because GNY learned of the lawsuits after the court rendered judgment, it was deprived of the opportunity to investigate the claim, to participate in and control aspects of the litigation, and to pursue settlement. This is enough to amount to material prejudice. *See e.g.*, *Hartford Ins. Co. v. Colonia Ins. Co.*, 58 Conn. App. 39, 44 (2000) (affirming trial court's decision finding prejudice where insurer did not learn of the judgment against insured until several months after it was rendered because delay deprived the insurer of an opportunity to investigate claim and to pursue compromise or settlement). REC argues that GNY cannot point to any litigation strategy that it would have changed and that the case could not be settled. REC cites no cases, however, requiring the insurer to identify specific changes to litigation strategy it would have made had timely notice been given or to prove that its earlier involvement would have had led to a favorable settlement. To the contrary, cases applying Connecticut law suggest that insufficient or late notice depriving the insurer of an *opportunity* to participate or to settle suffice to demonstrate prejudice. *See Main Street*, 2022 WL 43866, at *11 (stating that the insurer is not "required … to prove the counterfactual that its attorneys could have performed better than [the insured's counsel]"); *see e.g.*, *id.* (where the insured failed to notify the insurer after a demand letter, the court rejected the insured's argument that the insurer failed to show prejudice because it did not prove how its investigation would have differed from the investigation conducted by the insured's counsel and held that the deprivation of the ability to

27

investigate the claim and engage in settlement negotiations was itself enough to demonstrate prejudice); *Zahoruiko*, 717 Fed. App'x at 52 (finding that a declaration from the insurer's employee stating that the insured's failure to give notice until after a default judgment denied the insurer of the opportunity to interview witnesses or participate in the defense or any proposed settlement of the claim was sufficient to demonstrate prejudice); *Ellis II*, 2017 WL 3011674, at *3–4 (holding that where the insured gave notice after a default judgment, an affidavit from an insurer's employee attesting that the insurer was precluded from investigating, defending, and settling the claim, *Ellis I*, 2017 WL 1238457, at *2, was sufficient to demonstrate prejudice); *Jazlowiecki*, 2014 WL 4746527, at *6 (finding that where the insurer learned of the litigation days before trial, the insurer was prejudiced because it was "robbed of the opportunity to evaluate the strength of the plaintiff's defense and the feasibility of settlement, to participate in discovery including the selection of expert witnesses, to retain independent and unbiased counsel, and/or to participate in any tactical decisions"). Therefore, GNY has shown that it was materially prejudiced, and REC has failed to raise a genuine dispute of material fact on this issue.

## V.   CONCLUSION

For the reasons above, I grant the GNY's cross-motion for summary judgment as to Count I and REC's remaining counterclaim. ECF No. 57. Since the granting of this motion resolves the issue of whether GNY is obligated to satisfy the Consolidated Lawsuit's judgment, I dismiss as moot the remaining counts of GNY's complaint, which seek the same relief on alternative grounds. In addition, I deny REC's motion for summary judgment, ECF No. 52, and deny as moot GNY's motion to amend, ECF No. 66.

I note that only REC responded to GNY's cross motion for summary judgment. Within 14 days of this order, the remaining defendants, CPA, RDR, and Dr. Robbins, shall show cause why I should not enter summary judgment against them for the same reasons discussed above.

IT IS SO ORDERED.

_____/s/_____

Michael P. Shea, U.S.D.J.

Dated:  Hartford, Connecticut
        March 23, 2022